Becker v. State



COURT OF APPEALS


EIGHTH DISTRICT OF TEXAS


EL PASO, TEXAS



)
 

RICKEY DEWAYNE WEBBER,
)
 No. 08-03-00177-CR

)


 Appellant,
)
 Appeal from

)
 

v.
)
 283rd District Court

)


THE STATE OF TEXAS,
)
 of Dallas County, Texas

)


 Appellee.
)
 (TC# F-0176323-RT)


O P I N I O N



 Rickey Dewayne Webber appeals his capital murder conviction. A jury found Appellant
guilty and the trial court assessed an automatic life sentence. See Tex.Code Crim.Proc.Ann. art.
37.071, § 1 (Vernon Supp. 2004). The trial court entered in the judgment an affirmative finding on
the use of a deadly weapon. Tex.Code Crim.Proc.Ann. art. 42.12, § 3g(a)(2)(Vernon Supp. 2004). 
We affirm.

FACTUAL SUMMARY


 On the evening of November 11, 2001, Reynaldo Rico went to the Military Quick Stop, a
combination store-restaurant, where his younger brother, Jesus, worked as a stocker and cook. 
Reynaldo ate and watched television while waiting for the store to close. Michael Head was also
working in the store that evening. While Jesus was in the cooler stocking soft drinks, a short, stocky
black male came into the store. He wore a muscle shirt and jeans and had a red and blue Polo shirt
draped over his shoulder. The man walked to the counter, purchased something and walked out. 
Moments later, a second black male walked into the store. This man was taller and thinner than the
first and wore a grey hooded sweatshirt. He also purchased something and left. A short time later,
Reynaldo heard the door open but he continued watching TV. By this time, Jesus had come out of
the cooler and he saw a short stocky black male purchasing cigarettes from Head. The man was
wearing a red Polo shirt. After making his purchase, he stood at the counter and twice looked back
over his shoulder at the door. In Jesus's opinion, it appeared as though he were giving a signal. The
man in the grey hooded sweatshirt then walked into the store holding a gun and the shorter man ran
around behind the counter to the cash register. 

 Reynaldo had not seen any of this but he looked up when he heard someone say, "Give me
your money." Reynaldo turned around and saw the man with the hooded sweatshirt holding a long
revolver and pointing it at Head. He also saw the same short stocky man behind the counter getting
the money from the cash register. He noticed that the short stocky man had pulled on the Polo shirt
which he had carried the first time he came in the store. Jesus saw Head open the cash register and
back away. Jesus and Reynaldo heard both men telling Head to give them the rest of the money. 
When the robbers saw Reynaldo and Jesus, they told them to get down on the floor. Suddenly,
Reynaldo and Jesus heard the stocky robber yell, "[H]e has a gun" and then they heard a shot. After
the shot, the robbers attempted to find the VCR tape for the security system. When they could not
find the tape, they removed the VCR itself and ran out of the store. Jesus locked the door and
pushed the silent alarm while Reynaldo called 911. They then attempted to help Head who was on
the floor next to his gun. He had been shot in the chest. The police and emergency services arrived
shortly thereafter but Head had died almost immediately because the slug had penetrated his heart. 
Reynaldo and Jesus gave written statements to the police that evening. Reynaldo estimated the
stocky robber's height at 5 feet 5 inches. Jesus opined that he was about 5 feet 6 inches tall and
appeared a "little bit strong." The police showed photo lineups to Reynaldo and Jesus but they could
not identify anyone because they had not clearly seen the robbers' faces.

 Police investigators obtained a latent fingerprint from the cash box underneath the counter
at the scene of the robbery. That latent print, which was unusually clear, was analyzed with the
assistance of AFIS (Automated Fingerprint Identification System) and it identified Appellant as a
suspect. A fingerprint expert then compared the latent print with the known prints of Appellant and
determined that it matched Appellant's right index fingerprint. Police obtained a warrant to arrest
Appellant for the capital murder of Head.

 Appellant was arrested at his apartment on December 17, 2001. When police entered the
apartment, Detective Daniel Moreno found Appellant on the floor of the apartment watching
television. He had one hand underneath a pillow. After the officers secured and handcuffed
Appellant, Moreno found a Smith and Wesson .38 Special revolver underneath the pillow with three
live rounds. According to Appellant's girlfriend, Kerressa Chumbley, Appellant had started carrying
the weapon shortly before the murder. The weapon and slug removed from Head's body were
submitted to a firearm and toolmark examiner for analysis. The examiner determined that the
weapon had five lands and grooves with a right twist and the slug has the impression from being
fired in a weapon with five lands and grooves with a right twist. The examiner could not
conclusively determine that the bullet which killed Head was fired by the .38 Special seized from
Appellant but he also could not eliminate it as the weapon. 

 Chumbley later visited Appellant in jail. During one of their conversations, Appellant started
to cry and told Chumbley that he and J.D. Horton had planned the robbery but they did not intend
to kill the complainant. When they saw that the complainant had a gun, Horton shot him with
Appellant's gun to prevent him from shooting Appellant. Chumbley did not call the police and
report what Appellant had told her. However, Detective Brent Maudlin later pulled the visitor's list
from the jail and saw that Chumbley had visited Appellant. He visited Chumbley at her home and
subsequently interviewed her at the police station. At the urging of her parents to tell what she knew,
Chumbley told Maudlin what Appellant had said about the offense.

 A grand jury indicted Appellant for intentionally causing Head's death while in the course
of committing a robbery but the State did not seek the death penalty. The charge included parties
instructions under Section 7.02(a) and (b) of the Texas Penal Code. The jury found Appellant guilty
of capital murder as alleged in the indictment and the trial court assessed a life sentence. 

FACTUAL SUFFICIENCY


 In Issue One, Appellant challenges the factual sufficiency of the evidence to sustain his
conviction. When conducting a review of the factual sufficiency of the evidence, we consider all of
the evidence, both admissible and inadmissible, but we do not view it in the light most favorable to
the verdict. Clewis v. State, 922 S.W.2d 126, 129 (Tex.Crim.App. 1996); Levario v. State, 964
S.W.2d 290, 295 (Tex.App.--El Paso 1997, no pet.). We review the evidence weighed by the jury
that tends to prove the existence of the elemental fact in dispute and compare it with the evidence
that tends to disprove that fact. Johnson v. State, 23 S.W.3d 1, 7 (Tex.Crim.App. 2000); Jones v.
State, 944 S.W.2d 642, 647 (Tex.Crim.App. 1996). A defendant challenging the factual sufficiency
of the evidence may allege that the evidence is so weak as to be clearly wrong and manifestly unjust,
or in a case where the defendant has offered contrary evidence, he may argue that the finding of guilt
is against the great weight and preponderance of the evidence. See Johnson, 23 S.W.3d at 11.
Although we are authorized to set aside the fact finder's determination under either of these two
circumstances, our review must employ appropriate deference and should not intrude upon the fact
finder's role as the sole judge of the weight and credibility given to any evidence presented at trial. 
See Johnson, 23 S.W.3d at 7. We are not free to reweigh the evidence and set aside a verdict merely
because we believe that a different result is more reasonable. Cain v. State, 958 S.W.2d 404, 407
(Tex.Crim.App. 1997); Clewis, 922 S.W.2d at 135.

 Appellant argues that the State's circumstantial evidence is so weak that the conviction is
clearly wrong and manifestly unjust. In addition to asserting that the Rico brothers lack any
credibility, he points out that they could not positively identify him as being either of the robbers. 
Appellant also maintains that there is no evidence excluding the possibility that he innocently placed
his fingerprint on the cash box at some other point in time. He also questions Chumbley's veracity
since their relationship had ended at the time she gave her statement to police. Finally, Appellant
contends that he had no intent to kill.

Identity
 

 The inability of the Rico brothers to make an in-court identification or pick out Appellant
from a photo lineup is not fatal to the State's case so long as other evidence shows that Appellant
was the perpetrator of the offense. See Clark v. State, 47 S.W.3d 211, 214-15 (Tex.App.--Beaumont
2001, no pet.); Conyers v. State, 864 S.W.2d 739, 740 (Tex.App.--Houston [14th Dist.] 1993, pet.
ref'd). Appellant certainly challenged the credibility of the brothers but not to the point that it could
be said that their testimony was completely unworthy of belief. Appellant, who was 5 feet 4 inches
tall and weighed 150 pounds at the time of his arrest, matched the basic description of the short
stocky robber who went behind the counter and grabbed the cash drawer. Further, his right index
fingerprint was found on the cash drawer and there is evidence that it was placed their recently as
it was unsmudged. The store owner, Peggy Chavez, testified that the cash box was inaccessible to
the public and Appellant had never been an employee of the store. The jury also heard evidence of
Appellant's confession to his girlfriend. Chumbley admitted that she and Appellant had engaged in
some heated discussions in December 2001, but she still loved Appellant at the time he made the
confession to her and she reported it to the police. Even taking into account any motivation by
Chumbley to give a false statement, Appellant's confession is consistent with the testimony of the
Rico brothers that the tall skinny robber shot Head after the stocky robber yelled that he had a gun. 
Finally, the gun found in Appellant's possession could not be eliminated as the gun which fired the
fatal bullet. That is also consistent with Appellant's confession that Horton shot Head with
Appellant's gun. Considering all of the evidence, we conclude that the evidence is factually
sufficient to establish Appellant's identity.

Intent


 Appellant also argues that the evidence is factually insufficient to show that he intended to
kill Head. Intent is a fact question for the trier of fact, and it may be inferred from the acts, words,
and conduct of the accused. Manrique v. State, 994 S.W.2d 640, 649 (Tex.Crim.App. 1999);
Wallace v. State, 52 S.W.3d 231, 234 (Tex.App.--El Paso 2001, no pet.). As a result of its nature,
mental culpability must generally be inferred from the circumstances under which a prohibited act
or omission occurs. Hernandez v. State, 819 S.W.2d 806, 810 (Tex.Crim.App. 1991); Wallace, 52
S.W.3d at 235.

 The trial court included in the charge an instruction under Section 7.02(b) of the Penal Code,
which provides:

 If, in the attempt to carry out a conspiracy to commit one felony, another felony is
committed by one of the conspirators, all conspirators are guilty of the felony actually
committed, though having no intent to commit it, if the offense was committed in
furtherance of the unlawful purpose and was one that should have been anticipated
as a result of the carrying out of the conspiracy.


Tex.Penal Code Ann. § 7.02(b)(Vernon 2003).

 Appellant told Chumbley that they had planned to commit the robbery but did not intend to
kill the complainant. Even without Chumbley's testimony, there is other evidence showing the pair
planned the robbery. Each man entered the store separately, approached the counter, and then left. 
Appellant returned, made a purchase, and then twice looked over his shoulder at the door. It
appeared to Jesus Rico that Appellant was giving a signal to someone. The second time Appellant
looked over his shoulder, Horton entered with a gun. Both men demanded money from Head and
Appellant went behind the counter. Horton shot Head when Appellant yelled that he had a gun. 
Appellant and Horton then left the store with the money and the VCR used by the security system. 
This evidence is factually sufficient to show that Appellant and Horton conspired to commit the
robbery and Horton killed Head in furtherance of the robbery. Additionally, the jury could have
reasonably inferred from the evidence that Appellant should have anticipated that someone could
be killed during the course of an armed robbery. See Williams v. State, 974 S.W.2d 324, 330
(Tex.App.--San Antonio 1998, pet. ref'd)(evidence factually sufficient show that defendant should
have anticipated murder which occurred during course of pawn shop robbery where he knew co-conspirator had a gun). Appellant's claim that he did not intend for anyone to be killed during the
robbery is irrelevant to a conviction under Section 7.02(b). See Ruiz v. State, 579 S.W.2d 206, 209
(Tex.Crim.App. [Panel Op.] 1979). We overrule Issue One.

PERSONAL KNOWLEDGE


 In Issue Two, Appellant argues that the trial court abused its discretion by permitting Jesus 
Rico to speculate that the tall robber could not have taken the money from the cash register. The
following exchange occurred during the State's re-direct examination of Jesus:

 Q. The guy that came behind the counter, could you tell whether or not
he was getting anything from either the cash register or from the
cabinet below?


 A. I didn't saw nothing, but I heard -- and when you pick up the money
from the cash register, you could hear the little clicks on the money.


 Q. Okay. And where was Mike at that point?


 A. Right here (indicating).


 Q. Okay. Was he lying down or was he still standing up?


 A. He was still standing up.


 Q. Okay. What was he doing with his hands?


 A. Just like putting them in front of him.


 Q. Like this?


 A. Yeah.


 Q. Like this?


 A. Yeah.


 Q. You could see that?


 A. Yes.


 Q. When you heard the clicks from money being taken out of the cash
register, could you see where the guy with the gray sweatshirt was?


 A. Yeah, he was right here.


 Q. Is it possible that he was the one that was getting the money out of the
cash register or the cash box?


 A. No, sir. 

 

At this point, Appellant objected to Jesus's testimony as speculation, but the trial court overruled the
objection. The testimony continued:

 

 Q. Is it possible that Mike was the one getting the money out of the cash
register or the cash box?


 A. No, sir.


 Q. Who was the only person that it was possible to get the money out of
the cash register or the cash box?


 A. The guy behind the cash register.


 Q. Okay. The stocky guy?


 A. Yeah.


 Q. Short guy?


 A. (Indicating yes.)


 Rule 602 provides that a witness may not testify to a matter unless "evidence is introduced
sufficient to support a finding that the witness has personal knowledge of the matter." Tex.R.Evid.
602. Personal knowledge will often come directly from the witness's senses. See Fairow v. State,
943 S.W.2d 895, 898 (Tex.Crim.App. 1997). Under Rule 701, a witness may give a lay opinion or
testify to an inference provided it is rationally based on the witness's perception. Tex.R.Evid. 701. 
We will not reverse the trial court's decision to admit evidence unless the record shows that the trial
court abused its discretion. Montgomery v. State, 810 S.W.2d 372, 391 (Tex.Crim.App.
1990)(opinion on reh'g). There is no abuse of discretion when the trial court's ruling lies within the
zone of reasonable disagreement. Powell v. State, 63 S.W.3d 435, 438 (Tex.Crim.App. 2001).

 The testimony at trial established that Jesus based his testimony on his observations. He
could see where both robbers were located in relationship to the complainant and the cash drawer. 
Based upon these observations, Jesus drew an inference that only Appellant was in a position to
reach the cash drawer and take the money. The trial court did not abuse its discretion in admitting
the testimony. Issue Two is overruled.

APPELLANT'S CONFESSION


 In Issue Three, Appellant contends that the trial court abused its discretion in admitting 
Chumbley's testimony about his confession because the prejudicial effect of the evidence
outweighed its probative value. Relevant evidence may be excluded if its probative value is
substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading
the jury, or by considerations of undue delay, or needless presentation of cumulative evidence. 
Tex.R.Evid. 403. Only "unfair" prejudice provides the basis for exclusion of relevant evidence. 
Montgomery, 810 S.W.2d at 389. Unfair prejudice arises from evidence that has an undue tendency
to suggest that a decision be made on an improper basis, commonly an emotional one. Id. Rule 403
favors the admission of relevant evidence and carries a presumption that relevant evidence is more
probative than prejudicial. Hayes v. State, 85 S.W.3d 809, 815 (Tex.Crim.App. 2002). In
determining whether the prejudicial effect of evidence substantially outweighs its probative value,
several factors must be considered:

 (1) how compellingly the evidence serves to make more or less probable a fact of
consequence; 


 (2) the potential the evidence has to impress the jury in some irrational but indelible
way; 


 (3) how much trial time the proponent needs to develop the evidence; and 


 (4) how great is the proponent's need for the evidence. 


Mozon v. State, 991 S.W.2d 841, 847 (Tex.Crim.App. 1999). In evaluating the trial court's
determination under rule 403, a reviewing court is to reverse the trial court's judgment "rarely and
only after a clear abuse of discretion," recognizing that the trial court is in a superior position to
gauge the impact of the relevant evidence. Mozon, 991 S.W.2d at 847.

 At the conclusion of the hearing on the admissibility of this evidence, the trial court stated
that the evidence was key to the State's circumstantial evidence case and it would not take a great
deal of trial time to present the evidence. As asserted by the State, Appellant's confession linked
him to the store at the time of the robbery and murder, making it more likely that he left his
fingerprint on the cash drawer at the time of the offense. Thus, the trial court properly concluded
that the evidence was a significant part of the State's case. Appellant does not identify any unfair
prejudice arising from the evidence. Appellant does argue, however, that the evidence has little or
no probative value because Chumbley is unworthy of belief. He does not cite any cases which
support his argument. In our view, an evaluation of a witness's credibility is not the proper measure
of the probative value of testimony. Taking the evidence as true, we determine its probative value
by examining its propensity to prove or disprove a fact is issue. If we examined the probative value
of evidence based on an assumption that the proffering witness lacks credibility, then Rule 403
would require the exclusion of evidence is every case where a witness's credibility has been
challenged. Finding no abuse of discretion, we overrule Issue Three.

CROSS-EXAMINATION


 In Issue Four, Appellant complains that the trial court improperly limited his cross-examination of Kerressa Chumbley. The trial court held a hearing outside the presence of the jury
to determine the admissibility of Chumbley's testimony about the confession as well as impeachment
matters. When police arrested Appellant at Chumbley's apartment, they transported Chumbley to
the police station for questioning about her relationship with Appellant and her knowledge about the
murder. Chumbley initially believed she had been taken to the police station because police had
found marihuana in her apartment at the time they arrested Appellant but she was not arrested or
handcuffed. Once at the station, however, they began questioning her about the murder. She told
police that she had no knowledge about this particular case, but Appellant had committed other
robberies in her presence. Chumbley maintained that she did not participate in any of these
robberies. Chumbley went home after the questioning concluded. She flatly denied cooperating
with police or giving a statement in order to resolve the potential marihuana charge. During the
weeks following Appellant's arrest, Chumbley's relationship with Appellant became strained
because he often accused her of "calling the police on him" and in early January he told her that he
did not want to see her anymore. On January 7, 2002, however, Appellant called Chumbley and
asked her to visit him. During this visit, Appellant confessed his involvement in the capital murder. 
Detective Maudlin also testified outside the presence of the jury. He recalled that Chumbley
discussed the other robberies with them but he did not make any reference during questioning about
illegal drugs found in the apartment and he never considered her a suspect in the robberies.

 At the conclusion of the hearing, Appellant's counsel asserted that Chumbley had offered a
false statement to police because she considered herself a suspect. But he noted that he could not
cross-examine Chumbley about her motive for making the statement without opening the door to
admission of Appellant's extraneous offenses. The trial court noted Appellant's quandary,
specifically referring to it as a matter of trial strategy, but the court informed Appellant that if he
opened the door during cross-examination of Chumbley, the extraneous offenses would be admitted.

 Chumbley then testified before the jury about Appellant's confession to her and Appellant
cross-examined her briefly, reserving his right to recall her during his case in chief. The trial court
later held a second hearing to determine whether Appellant could question Chumbley about her
motive for cooperating with police. Chumbley specifically testified that the police had not
threatened her with jail if she did not give a statement against Appellant and she did not believe
otherwise. Appellant's counsel, however, showed Chumbley two letters she had written to Appellant
while he was in jail. In the second letter, written on December 31, 2001, Chumbley said:

 I was thinking about how you said that I gave them a reason to link all this bullshit
to you. You don't know what I went threw in that room that man told me everything
I said to you on the phone that day I told you to watch the news, this is how he came
at me when we was coming back from the restroom. He stopped & some man took
4 different up close pictures of me. So when we went back in the room he started
telling me about the murder case and he said now we already know that Rickey was
not the one who killed that man we know it was J.D. He didn't say James Horton he
said J.D. So I was like I don't know nothin about it. He kept asking kept asking. So
finally he left out for about 1 hour & came back with all these papers & files and he
said what happened at the store with the Chinese man. And I said I don't know and
he sat there for a min. and pulled out the police report and I overlooked it. I seen my
car plates, described to the T. And he took it & said I'm going to ask you one more
time what happen. My picture was on them files I asked him was you there and he
was like no not yet. So when I was going back and forth to the restroom I seen your
picture. I found out that night that they have been watching my car & both of us for
the past 2 1/2 weeks. That man told me that my car has been involved in like 6 or 7
robberys [sic], and I was like I didn't know anything about it. I seen all these police
reports with my car plates, dents and everything.


. . .


 

 He asked me would I testify against you & J.D. on that issue you in there for and I
told him I can't testify against something I don't know about and I'm not testifying
against Rickey either. Now he told me that if I don't and they need me too then I
could get some jail time. So that what I told my momma & we have our eyes set on
3 different lawyers. Why they let me go I don't know but hey I probably never will.


 When questioned about her comments in the letter, Chumbley explained that the police had
threatened her with jail if she withheld information about the crime. She did not feel pressured
because she did not have any knowledge about the murder and it was her mother's idea to hire a
lawyer. Chumbley made her final comment in response to Appellant's statement that she should be
in jail for the marihuana found in the apartment. 

 Appellant's attorney requested that he be allowed to impeach Chumbley with certain
statements contained in the letters with the understanding that it would not open the door to
admission of the extraneous offenses. The trial court determined that Appellant could question
Chumbley about her knowledge of Rickey's involvement in the capital murder and establish that she
had this information at the time she went to visit him at the jail. Additionally, the court permitted
Appellant to establish that the officers asked her if she would testify against Appellant and she said
that she did not have any information. But if he impeached Chumbley with the statements showing
she might have felt pressured by the police to give a statement or testify against Appellant, it would
open the door for the State to show the matters she was aware of that might create that pressure,
namely, the extraneous offenses. Appellant complained that the ruling violated his substantial rights
because he would not be permitted to show Chumbley's bias and motive for cooperating with police
and giving the statement about the confession.

 The Sixth Amendment to the United States Constitution guarantees the right of an accused
in a criminal prosecution to be confronted with the witnesses against him. U.S. Const. Amend. IV.
A primary interest secured by the Confrontation Clause is the right of cross-examination. Lopez v.
State, 18 S.W.3d 220, 222 (Tex.Crim.App. 2000). This constitutional right of confrontation is
violated when appropriate cross-examination is limited. Carroll v. State, 916 S.W.2d 494, 497
(Tex.Crim.App. 1996). Appropriate cross-examination includes all avenues reasonably calculated
to expose a motive, bias, or interest for the witness to testify. Carroll, 916 S.W.2d at 497. A trial
judge is permitted, however, to place reasonable limits on cross-examination. See Carroll, 916
S.W.2d at 498. 

 The trial court did not restrict Appellant's right of cross-examination. The trial court simply
ruled that if Appellant asked certain questions which opened the door, the State would be permitted
to introduce evidence regarding the extraneous offenses. Extraneous offenses may be admissible
where the accused opens the door to their admission. See Monkhouse v. State, 861 S.W.2d 473, 476
(Tex.App.--Texarkana 1993, no pet.); Creekmore v. State, 860 S.W.2d 880, 892 (Tex.App.--San
Antonio 1993, pet. ref'd)(op. on reh'g). Appellant was faced with a difficult choice but he was not
prohibited by the trial court from asking the questions he wished to ask Chumbley. The difficulty
of the choice does not impose an impermissible burden upon the right of confrontation. Cf. Cantu
v. State, 738 S.W.2d 249, 256 (Tex.Crim.App. 1987)(acknowledging that decision whether to waive
right against self-incrimination and testify, knowing that defendant will be subjected to
cross-examination and possibility of opening the door to unfavorable evidence, including
impeachment with prior criminal record, is a difficult one; nevertheless, difficulty of the choice does
not impose an impermissible burden upon the exercise to Fifth Amendment rights and does not result
in a constitutional violation). Issue Four is overruled.

HEARSAY


 In Issue Five, Appellant asserts that the trial court abused its discretion by admitting hearsay
over his objection. Detective Richard Moore is a fingerprint expert who compared the latent print
found on the cash box with Appellant's prints and determined that the latent print matched
Appellant's right index finger. During the State's direct examination, Moore explained the scientific
methodology involved in fingerprint comparison and how he determined that the latent print matched
Appellant's print:

 [Moore]: Specifically, what you look for are identification points or minutia,
which if you were to look at the friction ridges or the lines of your
finger, some of the lines that continue through the print will come to
an end or stop. That terminal end is an identification point, an ending
ridge. There are other ridges that might flow through your finger that
would split into two ridges. Where it splits is called a bifurcation. 
That bifurcation may continue along and then join together again,
which would form two different bifurcations. Each of those
bifurcations are identification points. And each time a fingerprint is
taken, it is just like a rubber stamp, those identification points will be
in the same spot each time. And as you look at one fingerprint
against another, you will be able to count the ridges between each of
these identification points. And according to the FBI, which is one
of your sources of identification information, the FBI says that if you
can find 12 points of identification --


 [Appellant's counsel]: Objection. That is hearsay, Judge.


 [The Court]: Well, overruled. Based upon his qualifications, he may testify to it.


 [Moore]: If you can find 12 points of identification in the same relative position
on both fingerprints, then you can say that those two fingers (sic)
came from the same finger. You don't have to have more than that. 
But you can, in fact, in some cases make your identification with less
than 12 points. 


The State made no further reference to the twelve-point requirement, but in direct response to a
question asked during cross-examination, Moore stated that he found twenty-nine points of
identification on the latent print and Appellant's fingerprint. 

 "Hearsay" is a statement, other than one made by the declarant while testifying at trial,
offered in evidence to prove the truth of the matter asserted. Tex.R. Evid. 801(d). Hearsay is not
admissible unless excepted by the rules of evidence, a statute, or a rule promulgated pursuant to
statutory authority. Barnum v. State, 7 S.W.3d 782, 789 (Tex.App.--Amarillo 1999, pet. ref'd);
Tex.R. Evid. 802. The facts or data upon which an expert bases an opinion or inference need not
be admissible in evidence if they are of a type reasonably relied upon by experts in the particular
field in forming opinions or inferences on the subject. Tex.R.Evid. 703. Further, an expert witness 
may disclose on direct examination or be required to disclose on cross-examination the underlying
facts or data supporting his expert opinion or inference. Tex.R.Evid. 705(a). When the underlying
facts or data are inadmissible, the trial court shall exclude the underlying facts or data if the danger
that they will be used for a purpose other than an explanation or support for the expert's opinion
outweighs their value as explanation or support or are unfairly prejudicial. Tex.R.Evid. 705(d).

 Assuming Moore's statement regarding the FBI's standard for fingerprint identification is
hearsay, it is admissible under Rules 703 and 705. Appellant is highly critical of the trial judge's
comment referring to the witness's qualification as an expert, but we believe the judge intentionally
referenced Moore's expert witness status in an effort to explain why he overruled the hearsay
objection. Appellant does not argue that the value of this evidence as support for the expert's
opinion is outweighed by the danger that the evidence would be used for an improper purpose or by
any unfair prejudice. Once again, we find no abuse of discretion and overrule Issue Five.

SECTION 7.02(B)


 In Issue Six, Appellant contends that the trial court erred by including in the charge a
conspiracy of parties theory under Section 7.02(b) of the Penal Code. He argues that the charge: 
(1) is inapplicable to capital murder cases because it dispenses with the culpable mental state
applicable to capital murder cases, (2) violates the Eighth and Fourteenth Amendments as well
Article I, Section 19 of the Texas Constitution because it is a comment on the weight of the
evidence, (3) was not accompanied by an instruction that Appellant could be convicted of capital
murder only if he had the requisite intent to kill, and (4) was not raised by the evidence.

 When reviewing charge error, we employ a two-step analysis. Washington v. State, 930
S.W.2d 695, 698 (Tex.App.--El Paso 1996, no pet.). We must first determine whether error actually
exists in the charge. Almanza v. State, 686 S.W.2d 157, 171 (Tex.Crim.App. 1984); Washington,
930 S.W.2d at 698. In making this determination, we view the charge as a whole and our review is
not limited to a series of isolated statements or portions of the charge standing alone. Washington,
930 S.W.2d at 698; see Holley v. State, 766 S.W.2d 254, 256 (Tex.Crim.App. 1989). Second, we
must determine whether sufficient harm resulted from the error so as to require reversal. Almanza,
686 S.W.2d at 171; Washington, 930 S.W.2d at 698. Which harmless error standard applies depends
upon whether the defendant objected. Abdnor v. State, 871 S.W.2d 726, 731-32 (Tex.Crim.App.
1994); Washington, 930 S.W.2d at 698. In a case where the defendant failed to object, he must show
that he suffered actual egregious harm. Almanza, 686 S.W.2d at 171; Washington, 930 S.W.2d at
698. Where there has been a timely objection made at trial an appellate court will search only for
"some harm." Abdnor, 871 S.W.2d at 732; Almanza, 686 S.W.2d at 171. Under Almanza, we
examine the error in light of (1) the entire jury charge, (2) the state of the evidence, including the
contested issues and the weight of the probative evidence, (3) the arguments of counsel, and (4) any
other relevant information. Almanza, 686 S.W.2d at 171.

 Turning to Appellant's first and third arguments, Section 7.02(b) allows criminal
responsibility for the conduct of another, thereby eliminating the necessity for proof of intent to
commit the felony actually committed, but it does not excuse the State from proving a culpable
mental state. Gravis v. State, 982 S.W.2d 933, 938 (Tex.App.--Austin 1998, no pet.). The statute
requires the state to show that the defendant had both the mens rea to engage in a conspiracy and the
culpable mental state to commit the underlying, i.e., the intended, felony. Id. The mental state
required for the underlying felony supplies the mens rea for the felony actually committed by the
co-conspirator. Id. Therefore, the statute is applicable to capital murder cases. See Cienfuegos v.
State, 113 S.W.3d 481, 494 (Tex.App.--Houston [1st Dist.] 2003, pet. stricken); Gravis, 982 S.W.2d
at 938; see also Johnson v. State, 853 S.W.2d 527, 534 (Tex.Crim.App. 1992)(noting that court has
continually held that Sections 7.01 and 7.02 are applicable to capital murder cases).

 Citing Clark v. Louisiana State Penitentiary, 694 F.2d 75, 77-78 (5th Cir. 1982), Appellant
next argues that the court's instruction constituted a comment on the weight of the evidence by
imputing an intent to kill based solely on Appellant's participation in a robbery conspiracy. In Clark,
the defendant was convicted of first-degree murder under Louisiana law and sentenced to death. The
Fifth Circuit held the Fourteenth Amendment was violated by a jury instruction (1) which relieved the
State of its burden to prove beyond a reasonable doubt, without aid of any imputation from a lesser
crime or the act of another, the specific intent to kill or inflict great bodily harm. The jury instruction
in Clark varies from Section 7.02(b) and the jury instruction given in the instant case because it did
not involve imputation of the intent to kill from a lesser crime. Further, the defendant did not argue
and the court did not hold that the conspiracy instruction was a comment on the weight of the
evidence. Finally, the instant case is distinguishable because Appellant was not assessed the death
penalty. (2) The trial court's instruction tracked the language in Section 7.02(b) and did not comment
on the weight of the evidence.

 We also find that the Section 7.02(b) instruction is raised by the evidence. Appellant
admitted to Chumbley that he and Horton intended to commit the robbery and other evidence
corroborates that confession. Appellant and Horton entered the store individually as though they
were "casing" it, and Jesus Rico believed that Appellant signaled Horton to enter the store the second
time. Appellant did not hesitate when Horton pulled and gun and both men demanded the money
from Head. There is also evidence from which the jury could infer that Appellant should have
anticipated that a murder could occur during the armed robbery. The trial court did not err in giving
the Section 7.02(b) instruction. Issue Six is overruled.

FINAL ARGUMENT


 In his seventh and eighth issues, Appellant complains about the State's final argument. In
Issue Seven, he asserts that the prosecutor improperly argued that in order to find Appellant not
guilty, the jury would have to conclude that every witness was lying. He argues that the court should
have granted his motion for mistrial because the prosecutor's argument impermissibly shifted the
burden of proof from the State. During the State's rebuttal argument, the prosecutor argued:

 For Rickey Webber to be not guilty, the Rico brothers have to be lying to you about
what happened in the store. Both of them have to be lying to you. Detective
Maudlin has to be lying to you about the participation of Kerressa Chumbley and
whether or not there was some agreement by them. Kerressa Chumbley has to be
lying to you about what the defendant told her at the jail and about whether or not the
police had asked her to do this. She has to be lying for the defendant to be not guilty. 
Peggy Chavez has to be lying. She has to be lying about the procedures of the store
or what she told the police. For the defendant in this case to be not guilty, every
single person that testified in this case has to have been lying.


 [Appellant's counsel]: Judge, that is improper argument and it is contrary to the law.


 [The Court]: Well, the jury will make a determination, and I would sustain the
objection to that wrong statement and the jury will disregard it.


 [Appellant's counsel]: Move for a mistrial.


 [The Court]: Denied. 


Preservation of Error


 To preserve error from jury argument, a party must object and pursue his objection to an
adverse ruling. Cockrell v. State, 933 S.W.2d 73, 89 (Tex.Crim.App. 1996). Furthermore, the
objection at trial must comport with the complaint on appeal. See Tex.R.App.P. 33.1(a); Turner v.
State, 87 S.W.3d 111, 117 (Tex.Crim.App. 2002), cert. denied, --- U.S. ----, 123 S.Ct. 1760, 155
L.Ed.2d 519 (2003). Appellant's general objection that the prosecutor's argument was "improper"
and "contrary to the law" did not preserve his complaint on appeal that the argument impermissibly
shifted the State's burden of proof. See Edwards v. State, 97 S.W.3d 279, 287 (Tex.App.--Houston
[14th Dist.] 2003, pet. ref'd)(defendant waived for appellate review his claim that State's closing
argument improperly asserted that defendant was confusing or misleading jury in prosecution for
improper sexual activity with a person in custody and sexual assault, because defendant's objection
at trial concerning State allegedly placing burden of proof on defendant did not comport with
defendant's claim on appeal).

 In Issue Eight, Appellant argues that the trial court abused its discretion in overruling his
objection to the following argument by the prosecutor: 

 [T]here is no possible way consistent with innocence that Rickey Webber can put his
fingerprint on that cash box.


Appellant objected that the argument to the argument as being outside of the record and inconsistent
with the evidence. The trial court overruled the objection. On appeal, Appellant argues that the
argument misstated the evidence and shifted the burden of proof to Appellant. With respect to the
latter argument, Appellant did not object on this ground at trial. Therefore his complaint is waived. 
See Edwards, 97 S.W.3d at 287.

 Appellant has preserved his argument that the prosecutor's argument misstated the evidence. 
Proper jury argument consists of: (1) summation of the evidence; (2) reasonable deductions from
the evidence; (3) answer to argument of opposing counsel; and (4) a plea for law enforcement. 
Alejandro v. State, 493 S.W.2d 230, 231-32 (Tex.Crim.App. 1973); Laca v. State, 893 S.W.2d 171,
185 (Tex.App.--El Paso 1995, pet. ref'd). In making this argument, the prosecutor referenced the
testimony of the store owner, Peggy Chavez, who testified that the cash box was inaccessible to the
public and Appellant had never been an employee of the store. Thus, the prosecutor's argument that
Appellant had not innocently placed his fingerprint on the cash box is a reasonable deduction from
the evidence. The trial court did not err in overruling the objection. Issues Seven and Eight are
overruled.

CUMULATIVE ERROR


 In Issue Nine, Appellant contends that the cumulative effect of the errors alleged in Issues
One through Eight denied him a fair trial. Because each issue has been overruled, there is no
cumulative error. See Chamberlain v. State, 998 S.W.2d 230, 238 (Tex.Crim.App. 1999)(holding 
that non-errors cannot in their cumulative effect cannot cause error). Issue Nine is overruled. We
affirm the judgment of the trial court.




April 15, 2004 

 ANN CRAWFORD McCLURE, Justice


Before Panel No. 1

Larsen, McClure, and Chew, JJ.

 

(Do Not Publish)
1. The jury was instructed: "Criminal conspiracy is defined in our code as the agreement or combination of two
or more persons for the specific purpose of committing any crime. Providing that agreement or combination to commit
a crime shall not amount to a criminal conspiracy unless in addition to such an agreement or combination one or more
of such parties does an act in furtherance of the object of the agreement or combination. If the intended basic crime has
been consummated, the conspirators may be tried for either the conspiracy or the completed offense. Each conspirator
in a conspiracy is deemed to assent to or to commend whatever is said or done in furtherance of the common enterprise
and it is therefore of no moment that such act was done or such declaration was made out of the presence of the
conspirator sought to be bound thereby. Or whether the conspirator doing such an act or making such declaration be or
be not on trial with his co-defendant."
2. The Eighth Amendment does not permit imposition of the death penalty upon one who participates in a
robbery but does not kill or contemplate the taking of a life. See Enmund v. Florida, 458 U.S. 782, 102 S.Ct. 3368, 73
L.Ed.2d 1140 (1982).